5 Cal.Rptr.3d 466 (2003)
112 Cal.App.4th 791
CDM INVESTORS et al., Plaintiffs and Appellants,
v.
AMERICAN NATIONAL FIRE INSURANCE COMPANY, et al., Defendants and Respondents.
No. H024142.
Court of Appeal, Sixth District.
October 15, 2003.
Rehearing Denied November 6, 2003.
Review Granted February 4, 2004.
*467 Alan L. Martini, Sheuerman, Martini & Tabari, San Jose, for Plaintiffs/Appellants: CDM Investors et al.
Hancock Rothert & Bunshoft, Ray L. Wong, William J. Baron, San Francisco, Mary C. Boyle, for Defendants/Respondents: Great American Ins. Companies, American Nat. Fire Ins. Co., American Alliance Ins. Co.
Gibson, Dunn & Crutcher, Dean J. Kitchens, Los Angeles, for Defendants/Respondents: Travelers Cas. and Sur. Co.
Selman Breitman, Nicholas Banko, Linda Wendell Hsu, Esther Lee, Los Angeles, for Defendants/Respondents: Transamerica Ins. Co.
PREMO, Acting P.J.
In this insurance coverage action, plaintiffs CDM Investors and Ralph Borelli appeal from a judgment that resulted after the trial court sustained the demurrers of defendants American National Fire Insurance Company, American Alliance Insurance Company, and Great American Insurance Companies (collectively, Great American), Travelers Casualty & Surety Company (Travelers), and Transamerica Insurance Group (TIG). They principally contend that the trial court misinterpreted standard form comprehensive or commercial general liability and excess/umbrella insurance policies (CGL policies) as not providing coverage for "response costs" incurred pursuant to an administrative order *468 that charged plaintiffs with being suspected dischargers of pollutants causing damage to soil and groundwater. We affirm the judgment.

SCOPE OF REVIEW
We review a general demurrer under well-established principles. The appeal presents the question of law whether the complaint, liberally construed, contains facts sufficient to entitle plaintiff to any relief. We assume the truth of all material facts properly pleaded in the complaint unless they are contradicted by facts judicially noticed, but no such credit is given to pleaded contentions or legal conclusions. (Financial Corp. of America v. Wilburn (1987) 189 Cal.App.3d 764, 768-769, 234 Cal.Rptr. 653.)

INSURANCE CONTRACT INTERPRETATION
"`While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' [Citations.] `The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' [Citation.] `Such intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citation.] `If contractual language is clear and explicit, it governs.' [Citation.]" (Foster-Gardner, Inc. v. National Union Fire Ins. Co. (1998) 18 Cal.4th 857, 868, 77 Cal.Rptr.2d 107, 959 P.2d 265, hereafter Foster-Gardner.)
Ambiguity exists when an insurance policy provision "`is capable of two or more constructions, both of which are reasonable.' [Citations.] The fact that a term is not defined in the policies does not make it ambiguous. [Citations.] Nor does `[disagreement concerning the meaning of a phrase,' or `"the fact that a word or phrase isolated from its context is susceptible of more than one meaning."` [Citation.] `"[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract."' [Citation.] `If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.' [Citation.]" (Foster-Gardner, supra, 18 Cal.4th at p. 868, 77 Cal.Rptr.2d 107, 959 P.2d 265.)
But if "a term in an insurance' policy has been judicially construed, it is not ambiguous and the judicial construction of the term should be read into the policy unless the parties express a contrary intent." (Bartlome v. State Farm Fire & Casualty Co. (1989) 208 Cal.App.3d 1235, 1239, 256 Cal.Rptr. 719.)

FACTUAL BACKGROUND
Plaintiffs owned commercial real property that they leased to tenants. In 1989, the California Water Quality Control Board (Board) ordered them to test the property for pollutants after it concluded that they were suspected dischargers of pollutants causing damage to soil and groundwater in the vicinity of the property. Plaintiffs notified defendants of the Board's order and claimed insurance coverage for the costs to respond. Defendants denied coverage. Plaintiffs paid a consulting firm approximately $230,000 to comply with the order. In 1997, the Board closed its investigation without taking further action after essentially concluding that plaintiffs' property was not the source of the pollution. Plaintiffs filed this action in 2000. They basically allege that coverage *469 existed and seek reimbursement for the response costs.

LEGAL BACKGROUND
"[T]he standard comprehensive general liability insurance policy was developed in 1940. [Citations.] Over the years that have followed, it has periodically been revised, appearing in various versions. [Citations.] It had its name changed to the standard commercial general liability insurance policy in 1986." (Certain Underwriters at Lloyd's of London v. Superior Court (2001) 24 Cal.4th 945, 955, 103 Cal. Rptr.2d 672, 16 P.3d 94, hereafter Powerine.)
CGL policies generally indemnify the insured for all sums the insured shall be obligated to pay by reason of liability for property damage as defined. (FMC Corp. v. Plaisted & Companies (1998) 61 Cal. App.4th 1132, 1142, 72 Cal.Rptr.2d 467.) The Supreme Court has established as general propositions "that contamination of the environment is property damage and, in essence, that amounts the insured is required to pay to reimburse government agencies and to comply with government orders under statutes such as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. § 9601 et seq.) and similar statutes, once hazardous wastes have been released, are sums the insured is obligated to pay by reason of liability for property damage." (Ibid.)
In Foster-Gardner, at issue was the language in the pre-1986 CGL policy establishing the duty to defend. The policy in the case stated, "`the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, ... and may make such investigation and settlement of any claim or suit as it deems expedient(Foster-Gardner, supra, 18 Cal.4th at p. 863, 77 Cal. Rptr.2d 107, 959 P.2d 265, italics added.) Taking a "`literal' approach" to interpreting the meaning of the word "suit" in the duty-to-defend clause, the court concluded "suit" was not ambiguous and denoted only a court proceeding initiated by the filing of a complaint. (Id. at pp. 869, 871-872, 879, 887, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Based on this policy language, the court held that the insurer's duty to defend the insured in a "suit" was limited to a civil action prosecuted in a court; it did not extend to an order issued by an administrative agency under an environmental statute. Under the policies in Foster-Gardner, an insurer was required to defend a suit, but had discretion to investigate and settle a claim. (Id. at p. 878, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Noting the juxtaposition, the court explained, that an administrative proceeding under environmental statutes does not constitute a "suit," i.e., a civil action prosecuted in a court, but rather implicates a "claim." (Id. at pp. 878-888, 77 Cal.Rptr.2d 107, 959 P.2d 265.)
Foster-Gardner was intended to "create[] a `bright-line rule that, by clearly delineating the scope of risk, reduce[d] the need for future litigation,'" by avoiding the "`case-by-case determination whether each new and different letter presenting the claim of an administrative agency is to be deemed the "functional equivalent of a suit brought in a court of law."' [Citation.]" (Foster-Gardner, supra, 18 Cal.4th at pp. 887-888, 77 Cal. Rptr.2d 107, 959 P.2d 265.) Among the distinctions established by the Supreme Court in Foster-Gardner was the contrast between, on the one hand a "`suit,'" i.e., a civil action in a court commenced by a complaint, and on the other hand a "`claim,'" which can be initiated by an *470 administrative proceeding. (Id. at p. 879, 77 Cal.Rptr.2d 107, 959 P.2d 265.)
Powerine involved interpretation of the word "damages" in the indemnification provision of pre-1986 primary CGL policies issued to the plaintiff by the defendants. While Foster-Gardner addressed the scope of the duty to defend, Powerine considered the reach of the duty to indemnify.
Specifically limiting its analysis to the standard CGL policy (Powerine, supra, 24 Cal.4th at p. 950, 103 Cal.Rptr.2d 672, 16 P.3d 94), the court in Powerine held that "the insurer's duty to indemnify the insured for `all sums that the insured becomes legally obligated to pay as damages' under the standard [CGL] insurance policy is limited to money ordered by a court." (Id. at pp. 960, 964,103 Cal.Rptr.2d 672,16 P.3d 94.)
This holding flowed directly from the so-called Foster-Gardner "`syllogism'" (Powerine, supra, 24 Cal.4th at p. 960, 103 Cal.Rptr.2d 672, 16 P.3d 94), which states: "The duty to defend is broader than the duty to indemnify. The duty to defend is not broad enough to extend beyond a `suit,' i.e., a civil action prosecuted in a court, but rather is limited thereto. A fortiori, the duty to indemnify is not broad enough to extend beyond `damages,' i.e., money ordered by a court, but rather is limited thereto." (Id. at p. 961, 103 Cal.Rptr.2d 672,16 P.3d 94.)
The Powerine court further explained that the term "`damages'" in its "full context" and in its "`ordinary and popular sense'" is limited to "money ordered by a court" because the provision that imposes the duty to defend "links `damages' to a `suit,' i.e., a civil action prosecuted in a court" (Powerine, supra, 24 Cal.4th at pp. 961-962, 969, 103 Cal.Rptr.2d 672, 16 P.3d 94), and because "in both the legal and the broader culture, `damages' exist traditionally inside of court." (Id. at p. 969, 103 Cal.Rptr.2d 672, 16 P.3d 94.) That is, the court elucidated, "`[d]amages' do not constitute a redundancy to a `sum that the insured becomes legally obligated to pay,' but a limitation thereof." (Id. at p. 963, 103 Cal.Rptr.2d 672, 16 P.3d 94.) This limitation, the court reasoned, "commends itself to society generally as laying down a bright-line rule," having "a tendency to promote fairness and efficiency in the judicial sphere." (Id. at pp. 965-966, 103 Cal. Rptr.2d 672, 16 P.3d 94.)
In reaching its decision, the Powerine court distinguished between the word "damages," present in the CGL policy, and the term "expenses," ordered by an administrative agency, which latter word did not appear in the analyzed indemnity provision. The duty to indemnify for "damages" in the primary policies, the Supreme Court stated, did "not extend to any expenses required by an administrative agency pursuant to an environmental statute-specifically, here, proceedings conducted before the Regional Water Boards. ..." (Powerine, supra, 24 Cal.4th at p. 966, 103 Cal.Rptr.2d 672, 16 P.3d 94, italics added.) The reason, the court explained, is that "expenses required by an administrative agency pursuant to an environmental statute, whether for the cleanup of a contaminated site and the abatement of the contamination's effects or otherwise, do not constitute money ordered by a court." (Id. at pp. 966, 969-971, 974, 103 Cal.Rptr.2d 672, 16 P.3d 94, italics added.)
Read together, Foster-Gardner and Powerine stand for the proposition that the duty to defend a "suit" seeking "damages" under pre-1986 CGL policies is restricted to civil actions prosecuted in a court, initiated by the filing of a complaint, and does not include claims, which can denote proceedings conducted by administrative *471 agencies under environmental statutes. Likewise, the duty to indemnify for "`all sums that the insured becomes legally obligated to pay as damages'" (Powerine, supra, 24 Cal.4th at p. 961, 103 Cal. Rptr.2d 672, 16 P.3d 94, italics added) in the same standard primary policies is limited to money ordered by a court, and does not include expenses such as may be incurred in responding to administrative agency orders.
"In 1986, the standard insurance form was amended to define `suit' as `a civil proceeding in which damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes an arbitration proceeding alleging such damages to which you must submit or submit with our consent.' [Citations.] Since then, this definition has been refined. Moreover, policies issued after 1985 generally include an absolute pollution exclusion." (Foster-Gardner, supra, 18 Cal.4th at p. 864, fn. 3, 77 Cal.Rptr.2d 107, 959 P.2d 265.)

DISCUSSION
The relevant insurance policies are attached to the third amended complaint and are standard form CGL policies.

Great American 1984 Primary Policy
This policy covers plaintiffs for "all sums which the insured shall become obligated to pay by reason of the liability imposed by law upon the insured, or assumed by the insured under any contract, for damages because of bodily injury, personal injury, advertising injury or property damage to which this policy applies arising out of an occurrence as defined herein."
Plaintiffs concede that there is no coverage under this policy because it is a pre-1986 policy governed by Foster-Gardner and Powerine. They argue, however, that they pleaded elements of waiver and estoppel so as to justify coverage. We disagree.
"[I]n the insurance context the terms `waiver' and `estoppel' are sometimes used interchangeably, even though estoppel requires proof of the insured's detrimental reliance." (Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 33, 44 Cal.Rptr.2d 370, 900 P.2d 619.)
Plaintiffs allege that, after they notified Great American of the Board's order, Great American requested that they sign a non-waiver agreement, "represented that it would investigate the claim," "requested certain information," and "reserved its rights." They then conclude that Great American waived its right to deny coverage on the ground that the Board order did not constitute a suit because the reservation of rights was not based on that ground.[1] They elaborate in the complaint: "GREAT AMERICAN purposefully failed to raise the `suit' issue as a defense and, in fact, intended to forego and waive the `suit' defense by intentionally omitting the defense from its reservation of rights letter.... Failure to raise the suit defense was intentional by GREAT AMERICAN in furtherance of its internal policies, claims handling practices, and litigation tactics, and based upon its interpretation of its policy and the relevant legal authority, as well as legal positions it assumed in other litigation."
Case law is clear that waiver is the intentional relinquishment of a known right after knowledge of the facts. (Waller v. Truck his. Exchange, Inc., supra, 11 Cal.4th at p. 31, 44 Cal.Rptr.2d 370, 900 *472 P.2d 619.) "A holding that an insurer waives defenses not asserted in its initial denial of a duty to defend would be inconsistent with established waiver principles by erroneously implying an intent to relinquish contract rights where no such intent existed." (Id. at p. 33, 44 Cal.Rptr.2d 370, 900 P.2d 619.)
Plaintiffs' allegation fails to state a waiver claim because it alleges no more than an intentional omission, which is the equivalent of alleging an implied waiver.
Plaintiffs also allege that they detrimentally relied on Great American's failure and refusal to raise the suit defense. They elaborate in the complaint: "[P]laintiffs proceeded to incur substantial costs in defending against such administrative proceedings believing that GREAT AMERICAN would not contend that the administrative proceedings did not amount to a `suit' under the policies. Had GREAT AMERICAN raised the `suit' defense in its reservation of rights letter ..., plaintiffs could have simply refused to initially comply with the Board orders, which would have resulted in the filing of a lawsuit by the Water Board against the plaintiffs, thereby obviating the `suit' defense which GREAT AMERICAN now attempts to raise."
This allegation fails to make out detrimental reliance because it alleges no more than that plaintiffs assumed that Great American had waived the suit defense, which is, again, the equivalent of alleging an implied waiver.

Great American 1987 Primary and Umbrella Policies; TIG 1989 Primary Policy
The Great American 1987 primary policy covers plaintiffs for "sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage.'" It obligates Great American "to defend any `suit' seeking those damages." It defines "suit" as "a civil proceeding in which damages because of `bodily injury,' `property damage,' `personal injury' or `advertising injury' to which this insurance applies are alleged. `Suit' includes an arbitration proceeding alleging such damages...." And the policy excludes coverage for (1) injury or damage "arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants" at or from owned, rented, or occupied premises, and (2) "loss, cost, or expense arising out of any governmental direction or request that you test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants."
The TIG policy is identical.
The Great American 1987 umbrella policy has a pollution exclusion identical to the 1987 primary policy.
Plaintiffs urge that Foster-Gardner and Powerine do not govern these policies because they incorporate the 1986 modifications to the standard CGL policy. They emphasize that the 1986 form now defines "suit" as being a "civil proceeding" including arbitrations. They reason that this definition "expands" the pre-1986 definition of suit to encompass administrative proceedings. They reach this conclusion as follows.
First, the 1986 form dropped the language differentiating between suits and claims, which formed the basis for the Foster-Gardner conclusion that the insurers intended to defend only lawsuits and pay claims in their discretion. And second, the 1986 form adds the pollution exclusion, which specifically excludes some, but not all, losses arising out of governmental requests or direction to test for, monitor, or clean up pollution. As to this point, plaintiffs urge that there would be no need to exclude certain governmental *473 requests if governmental requests were not civil proceedings in the first instance. They bolster this point by citing AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 (hereafter AIU), where the court held that response costs (the cost of reimbursing government agencies and complying with injunctions ordering a cleanup) constituted damages under CGL policies, damages being a hallmark of a civil proceeding.[2]
Plaintiffs' fallback position is that the definition of civil proceeding is at least ambiguous and can be reasonably construed to encompass administrative proceedings thereby making resolution of the question improper via demurrer.
We need not address this issue because, even if we agreed with plaintiffs, the pollution exclusion precludes coverage.
"The pollution exclusion at issue here is known as an `absolute pollution exclusion.'" (Legarra v. Federated Mutual Ins. Co. (1995) 35 Cal.App.4th 1472, 1480, 42 Cal.Rptr.2d 101.) Section I, coverage A, paragraph 2(f)(2) of the policy clearly states that the insurance does not apply to "Any loss, cost, or expense arising out of any governmental direction or request that you test for ... pollutants." There can be no question that the Board ordered plaintiffs to test for pollutants and plaintiffs seek reimbursement for the costs incurred to make the tests.
Plaintiffs make no convincing argument that the costs for which they seek reimbursement were not government-directed costs within the meaning of paragraph 2(f)(2). As alluded to earlier, plaintiffs urge that the pollution exclusion excludes some, but not all, losses arising out of governmental requests or direction. They apparently rely on the trial court's conclusion that the provision did not exclude "the cost of `responding to' or `assessing the effects of pollutants.'" They state that "a plain reading of the pollution exclusion does not include such activities as performing a site assessment and ascertaining potential sources of the contamination, including a determination of the relative risks and benefits of alternative responses, including doing nothing."
Plaintiffs are correct about what the exclusion does not say, but the point does not avail them. This follows because the language of the exclusion is non-specific and all-encompassing ("Any loss, cost, or expense arising out of any governmental direction or request").[3]

*474 Great American 1984 and 1985 Umbrella Policies
These Great American policies cover plaintiffs for "the ultimate net loss in excess of the underlying [coverage] which the insured shall become legally obligated to pay ... for damages because of property damage. They obligate Great American to "defend any suit ... seeking damages" with respect to any covered occurrence not covered by the underlying insurance "but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient." And they define "ultimate net loss" as "all sums which the insured shall become legally obligated to pay as damages arising from an occurrence to which this policy applies" and "all expenses incurred by the insured in the investigation, negotiation, settlement and defense of any such claim or suit seeking such damages."
Plaintiffs urge that Foster-Gardner and Powerine do not govern these policies because they indemnify for "ultimate net loss," which broadens the coverage beyond "damages." They point out that "ultimate net loss" includes all expenses incurred by the insured in the investigation and defense of claims or suits seeking damages. They reason that the implication of the ultimate-net-loss definition is twofold: "that under this policy, as compared with the policies at issue in the Powerine decision, it was specifically contemplated that there could be `claims' for `damages' (not merely lawsuits) and that the insurer would indemnify the insured for expenses incurred in connection with such claims, provided the claims sought damages potentially covered by the policy." (Original underscoring.) They conclude that "so long as the response costs ... amount to `damages' (compensation for harm suffered under AIU) and are not `prophylactic' these umbrella policies must provide coverage."
Great American poses that plaintiffs read the policies out of context. It points out the following: (1) the coverage clause indemnifies for damages, which, under Powerine, means a court-ordered loss ("pay ... ultimate net loss ... for damages"); and (2) the defense clause requires it to defend lawsuits but gives it the option to negotiate and settle claims or suits ("may make ... investigation, negotiation and settlement of any claim or suits"). (Italics in original.) It reasons that an interpretation requiring it to indemnify for response costs (claim for damages) would ignore the policies' distinction between suits (defense and indemnity obligations) and claims (option to settle). It urges that (1) the clause defining "ultimate net loss" cannot create coverage where none exists under the coverage clause, and (2) the ultimate-net-loss clause itself subordinates itself to the coverage and defense clauses ("ultimate net loss" is "all sums ... arising from an occurrence to which this policy applies" and "all expenses" incurred for "any such claim or suit seeking such damages"). It concedes that the term "expenses" as used in the ultimate-net-loss clause could be interpreted to allow *475 for indemnification of response cost claims. But it argues that this obligation exists only where the basic coverage conditions are met (judgment or insurer-approved settlement). It states: "Before [plaintiffs] could recover expenses for defense costs under the `ultimate net loss' clause, [they] would have to satisfy the policies' basic coverage requirements, including the requirement of liability imposed in court as `damages' or liability imposed under a settlement approved by Great American."
Plaintiffs counter that "it is reasonable to conclude that the insurer not only agrees to indemnify for expenses incurred in defense of claims seeking damages, but also to indemnify for the sums the insured becomes legally obligated to pay as `damages,' (interpreted in light of the fact that claims can seek damages under the definition of `ultimate net loss') whether or not the claim resolves in judgment or insurer approved settlement." Plaintiffs bolster this point by referring to the loss-payable clause, which provides for two ways in which an insured can make an indemnity claim under the policy, including one that does not require a judgment or insurer-approved settlement. This provision states: "The company's liability under this policy with respect to any occurrence shall apply only after the insured or underlying insurers' have paid or become obligated to pay the amount of the underlying limit or the retained limit as a result of such occurrence, [¶] The insured shall make claim for any loss under this policy within twelve (12) months after (1) the insured shall have paid ultimate net loss in excess of the underlying limit or retained limit with respect to any occurrence, or (2) the insured's obligation to pay such amounts shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company." (Italics added.)
We agree with Great American.
The coverage clause imposing the duty to indemnify is clear in its limitation to court-rendered damages. It states: "The company will pay ... the ultimate net loss ... which the insured shall become legally obligated to pay ... for damages." (Cf. Powerine, supra, 24 Cal.4th at p. 961,103 Cal.Rptr .2d 672, 16 P.3d 94 ["In its language, especially `damages,' the provision imposing the duty to indemnify is clear in its limitation to money ordered by a court"].) And the policy contains a duty to defend "suits," which links the term "damages" to a civil action. (Id. at pp. 961-962, 103 Cal.Rptr.2d 672, 16 P.3d 94.)
We disagree with plaintiffs that the phrase "ultimate net loss" in the coverage clause expands the definition of damages when the ultimate-net-loss definition clause is taken into consideration. The phrase in the coverage clause is used in reference to what amount the insurer will pay after the insurer becomes obligated to pay rather than as a trigger of the insurer's obligation to pay. In other words, the coverage clause reads that the insurer will pay ultimate net loss when that loss ripens into damages. It is unreasonable to interpret the clause to read that the insurer will pay an ultimate net loss when the insured incurs an expense that is defined as an ultimate net loss because such an interpretation ignores the (1) "for damages" qualifier in the coverage clause, and (2) implicit meaning of "ultimate" in "ultimate net loss," which suggests finality and, in context with the "for damages" qualifier, judgment-finality.
It is not at all incongruous for the policy via the use of "ultimate net loss" in the coverage clause and the ultimate-net-loss definition clause to contemplate indemnity for expenses while limiting such indemnity *476 to expenses included in a judgment or insurer-approved settlement. This concept was mentioned in passing in ALU as noted in Powerine. In AIU, "we held to the effect that the duty to indemnify may embrace all money ordered by a court, including `money that the insured must give under law as compensation to third parties' and also `money that the insured must itself expend in equity in order to provide relief of the same sort.' [Citation.] We did not hold that the duty extends to any money in addition to that ordered by a court-including any expenses required by an administrative agency pursuant to an environmental statute. Indeed, we did not even consider the issue." (Powerine, supra, 24 Cal.4th at p. 966, 103 Cal.Rptr.2d 672,16 P.3d 94.)
We decline to consider whether the coverage clause might be construed in the way plaintiffs urge when the loss-payable clause is taken into consideration. A loss payable provision is a condition of coverage, not a limitation thereof, and cannot be read to limit or expand the coverage obligation. (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2002) § 3:158, p. 3-2 (rev. # 1 2001) ["As a general rule, conditions neither confer nor exclude coverage"].)
In short, the coverage clause unambiguously provides that damages trigger indemnity and the ultimate-net-loss concept merely expands the amount of damages rather than the ripening of the indemnity obligation. Powerine's definition of damages therefore controls.
We do not ignore that plaintiffs' payment of the response costs in this case might have obviated the necessity of a lawsuit or insurer-approved settlement and plaintiffs concomitant ability to obtain insurance reimbursement. But "[i]n arriving at our conclusion, we decline to rewrite the provision imposing the duty to indemnify in order to remove its limitation to money ordered by a court. We will not do so for the insured itself, in order to shift to the insurer some or all of the potentially substantial costs that might be imposed on the insured as the outcome of a proceeding conducted before an administrative agency pursuant to an environmental statute. Neither will we do so for considerations of public policy, in order, perhaps, to promote the outcome itself through such a shifting of costs-for example, to advance the cleanup of a contaminated site and the abatement of the contamination's effects by calling in the insurer's resources in supplement to those of an insured that is prosperous or in place of those of an insured that is not. Our reason is that we do not rewrite any provision of any contract, including the standard policy underlying any individual policy, for any purpose. [Citation.] To do so with regard to the standard policy, with which we are here concerned, might have untoward effects generally on individual insurers and individual insureds and also on society itself. Through the standard policy, individual insurers made promises, and individual insureds paid premiums, against the risk of loss. To rewrite the provision imposing the duty to indemnify in order to remove its limitation to money ordered by a court might compel insurers to give more than they promised and might allow insureds to get more than they paid for, thereby denying their `general[ ] free[dom] to contract as they please[ ]' of any effect in the matter. [Citation.] It is conceivable that to rewrite the provision thus might result in providing society itself with benefits that might outweigh any costs that it might impose on individual insurers and individual insureds. It is conceivable. But unknown. Knowledge `depend[s] in large part on' what we are ill suited for, that is, the `amassing and analyzing *477 of complex and extensive empirical data.' [Citation.] Without such knowledge, we could not proceed." (Powerine, supra, 24 Cal.4th at pp. 967-968, 103 Cal. Rptr.2d 672, 16 P.3d 94.)

Travelers 1986 Umbrella Policy
The Travelers umbrella policy is similar to the Great American umbrella policies and covers plaintiffs for "the ultimate net loss in excess of the applicable underlying limit which the insured shall become legally obligated to pay as damages" and defines "ultimate net loss" as "the sum actually paid or payable in cash in the settlement or satisfaction of any claim or suit for which the insured is liable either by adjudication or settlement with the written consent of the company."
Our analysis of Great American's 1984 and 1985 umbrella policies applies here. The Powerine definition of damages precludes coverage for plaintiffs' response costs.

CDM'S THIRD-PARTY LAWSUIT
Shortly after the Board's order, plaintiff CDM sued its former tenants under CERCLA in federal court. The third amended complaint in this case alleges that (1) plaintiffs sued the tenants to apportion liability for the response costs, and (2) the tenants raised affirmative defenses seeking to apportion responsibility to plaintiffs. Plaintiffs conclude that the affirmative defenses are the functional equivalent of a counterclaim and that defendants had a duty to defend them as to those affirmative defenses. From this, plaintiffs bootstrap coverage for the response costs by characterizing the affirmative defenses as a suit seeking damages.[4] Plaintiffs detail their theory as follows.
"[U]nder CERCLA, the affirmative defenses raised by the tenants, including that [CDM] was negligently responsible for the contamination gave the federal court jurisdiction to apportion response costs under ... CERCLA among the defendants and [CDM] and to specifically find [CDM] jointly and severally liable for the response costs to the tenants. [Citation.] Under CERCLA, and the federal court's interpretation of its jurisdiction ..., the tenants did not need to file a counterclaim for apportionment in order to give the court the requisite jurisdiction to actually assess liability for response costs to the plaintiff. Apportionment of liability among all potentially responsible parties, including plaintiff, and apportionment of contribution rights among the parties is per se within the jurisdiction of the court under [CERCLA]. Thus, the `tenant action' filed in federal court, which was tendered to [defendants] for defense and indemnity, raised the potentiality of a judgment for declaratory relief and damages imposing joint and several liability for response costs and contribution to CDM, and enforceable against CDM by the tenants."
We disagree with plaintiffs' analysis. In 3250 Wilshire Boulevard Bldg. v. Employers Ins. of Wausau (1995) 39 Cal.App.4th 1277, 46 Cal.Rptr.2d 399 (hereafter Wilshire), the plaintiff sued a tenant for breaches of the lease, including failure to pay rent. The defendant counterclaimed for damages for breach of the lease, and *478 his answer contained similar allegations as defenses. The plaintiff tendered the defense of the counterclaim to its business liability insurer, which accepted the tender and eventually settled the counterclaim by paying the defendant $50,000. The plaintiff then demanded that the insurer provide it with a defense to the defendant's defenses. The insurer refused. The plaintiff then prosecuted its claims against the defendant to a successful conclusion, incurring legal fees in the process. The plaintiff then sued the insurer, alleging that its refusal to defend against the defendant's defenses was a breach of the duty to defend ("`duty to defend any "suit" seeking those damages'"). (Id. at p. 1280, 46 Cal.Rptr .2d 399.) The insurer demurred, contending that the liability policy did not obligate it to furnish legal services for the plaintiffs prosecution of its action against the defendant because the defendant's defenses had no potential to result in a judgment holding the plaintiff liable to pay damages to the defendant. The trial court agreed, sustained the demurrer without leave to amend, and dismissed the plaintiffs action. On appeal, the court affirmed. It reasoned that, under the policy, the insurer had the duty to defend any suit seeking damages because of bodily injury, property damage, personal injury or advertising injury. "This provision did not obligate [the insurer] to prosecute plaintiffs claims against [the defendant], because neither the prosecution of plaintiffs prima facie case nor the defeat of [the defendant's] defenses thereto could be considered the defense of a suit seeking damages." (Ibid.)
We glean from Wilshire the principle that, under ordinary duty-to-defend language, an insurer has no duty to defend an affirmative defense asserted against the insured in an insured-initiated action.
The Supreme Court has modified this principle in Construction Protective Services, Inc. v. TIG Specialty Ins. Co. (2002) 29 Cal.4th 189, 126 Cal.Rptr.2d 908, 57 P.3d 372 (hereafter TIG Specialty). There, the plaintiff sued the defendant for nonpayment of security services. The defendant answered and asserted as a setoff the affirmative defense that the plaintiff was responsible for fire damage on the defendant's property. The plaintiff tendered the defense of the setoff claim to its insurer, the insurer refused the tender, and the plaintiff sued the insurer. The trial court sustained the insurer's demurrer after concluding that an insurer does not have a duty to defend against affirmative defenses raised in response to an insured's complaint against another party. The Supreme Court agreed that "a defendant may not obtain an award of affirmative relief against a plaintiff by way of [Code of Civil Procedure] section 431.70 [affirmative relief may not be claimed in an answer]; rather, the defendant may only assert the setoff defensively to defeat the plaintiffs claim in whole or in part." (Id. at p. 198, 126 Cal.Rptr.2d 908, 57 P.3d 372.) But it nevertheless affirmed the Court of Appeal judgment reversing the trial court. It explained as follows.
"This interpretation of the Code of Civil Procedure does not, however, resolve the question whether a setoff claim constitutes a suit seeking damages for purposes of a comprehensive general liability insurance policy. Though a defendant may not obtain affirmative relief by way of a setoff claim, the defendant does reduce the claim to a monetary value by successfully asserting it as payment for the liability the plaintiff is alleging in its complaint. And this point brings us back to the heart of [plaintiffs] argument. If not for the [security services] debt [the defendant] owed to [plaintiff], [the defendant's] fire damages claim against [plaintiff], if asserted in a *479 court of law, would unquestionably have been a suit for damages. But because of its debt to [plaintiff], [the defendant] could allege the claim as a setoff rather than by way of complaint. For accounting purposes, however, the effect was no less a monetary recovery than would be a damages award. In these circumstances, [plaintiff] argues we should treat the setoff claim as a suit for damages. [¶] We decline to decide this question in a case like this one where the precise terms of the insurance policy are not before us. Nevertheless, we affirm the judgment of the Court of Appeal. [Plaintiffs] complaint adequately stated a prima facie right to relief, and therefore the Court of Appeal was correct to reverse the trial court's order sustaining the demurrer. In an action based on a written contract, a plaintiff may plead the legal effect of the contract rather than its precise language. [Citation.] [Plaintiff] has chosen to proceed in this manner, and though the complaint could have been clearer, it satisfactorily alleged (1) that the insurance policy obligated TIG Insurance to defend and indemnify [plaintiff] against suits seeking damages, and (2) that under the terms of the policy, [the defendant's] setoff claim fell within the scope of that contractual obligation. Whether [plaintiff] can prove these allegations (that is, whether its interpretation of the applicable contractual language is correct in light of what we have said here) remains to be seen, but the allegations are sufficient to establish a prima facie right to relief. TIG Insurance may move for judgment on the pleadings or summary judgment, raising the same arguments it raised in its demurrer, and in support of its motion it may provide the court with a copy of the insurance policy in question." (TIG Specialty, supra, 29 Cal.4th at pp. 198-199, 126 Cal.Rptr.2d 908, 57 P.3d 372.)
We glean from TIG Specialty that a setoff affirmative defense could constitute a suit seeking damages for purposes of a CGL policy if the affirmative defense (1) would unquestionably have been a suit for damages if asserted in a court of law, and (2) fell within the scope of the contractual obligation. Plaintiffs' allegations, however, fail to make out a cause of action because they fail to satisfy the above first prong.
Here, plaintiffs' tenants had no independent suit against CDM that they sought to reduce to a monetary value by asserting it as a setoff payment for the liability that CDM was alleging against them. They had no claim whatsoever and could not have sued CDM for anything. Regardless of plaintiffs' characterization of a CERCLA proceeding to apportion liability, the reality of CDM's CERCLA case is that CDM sued the tenants for indemnity as to an obligation imposed upon it by the Board and the tenants countered with an indemnity claim against CDM. In this posture, the tenants' indemnity claim was purely defensive-it sought and functioned only to reimpose upon CDM what CDM was already legally obligated for. It therefore cannot be characterized as the functional equivalent of an allegation seeking affirmative relief that could have been asserted as a suit for damages, which, in turn, might constitute a suit for damages within the meaning of the usual CGL policy duty-to-defend provision.

DISPOSITION
The judgment is affirmed.
WE CONCUR: BAMATTRE-MANOUKIAN, and WUNDERLICH, JJ.
NOTES
[1] It is unclear from the third amended complaint whether Great American specified any ground for its denial of coverage under the 1984 primary policy.
[2] AIU distinguished between response costs where there has already been contamination and "prophylactic" costs to the extent that the latter would not constitute covered damages because such costs would not result from property damage. "We do agree that prophylactic costs-incurred to pay for measures taken in advance of any release of hazardous waste-are not incurred `because of property damage.' [Citations.] Until such damage has occurred, whether on the waste site itself or elsewhere, there can be no coverage under CGL policies. Beyond this limited circumstance, however, and because the agencies in this suit allege that the waste sites themselves and the water on and surrounding the sites have already been contaminated by hazardous waste, we conclude that the reimbursement and the costs of injunctive relief sought here at least in part constitute `damages because of property damage.'" (AIU, supra, 51 Cal.3d at p. 843, 274 Cal.Rptr. 820, 799 P.2d 1253.)
[3] Plaintiffs mention in passing that the pollution-exclusion argument does not apply to TIG's policy because TIG did not raise the argument in its brief (nor did TIG join in or adopt by reference the relevant part of Great Americans brief (Cal. Rules of Court, rule 13(a)(5))). We disagree. Our review is de novo, the TIG and Great American policies are identical, the argument was made, and plaintiffs responded. No purpose would be served by reversing as to TIG (if such were justified) only to compel TIG to move below for summary judgment. In any event, we are not precluded from addressing points even when the points are completely neglected by the parties. "The general rule is `that ordinarily where a party has neglected to present a point in his brief he may be precluded from insisting that the court consider the point when deciding the case.... However, we know of no hard-and-fast rule which prohibits the court from considering and deciding points of law which may not have been urged and argued in the briefs originally filed if it appears to the court that an important legal principle is necessarily involved in the newly discovered point and that a proper disposition of the case requires a discussion and decision of that point.' [Citations.]" (Kurlan v. Columbia Broadcasting System (1953) 40 Cal.2d 799, 806, 256 P.2d 962.)
[4] Under this theory, the Great American 1987 primary and umbrella policies and the TIG 1989 primary policy would not be implicated given that those policies' pollution exclusion applies. The Travelers 1986 umbrella policy does not contain a duty to defend but is implicated under plaintiffs' theory to the extent that it indemnifies for damages. The Great American 1984 Primary Policy contains a duty to "defend any suit...." And, as recounted above, the Great American 1984 and 1985 umbrella policies contain a duty to "defend any suit ... seeking damages."