**NEWNAM MANUFACTURING, INC. and Dalton Corporation, Appellants–Defendants,**

v.

**TRANSCONTINENTAL INSURANCE COMPANY, Appellee–Plaintiff.**

No. 57A05–0606–CV–344.

Court of Appeals of Indiana.

Aug. 8, 2007.

George M. Plews, Donna C. Marron, Amy E. Romig, Plews Shadley Racher & Braun, Indianapolis, IN, Michael M. Yoder, Yoder & Mowery, P.C., Kendallville, IN, Attorneys for Appellants.

Martha S. Hollingsworth, Kent D. Zepick, Karl L. Mulvaney, Bingham McHale LLP, Indianapolis, IN, Jan M. Michaels, Steven Schulwolf, Michaels & May, P.C., David E. Schoenfeld, James P. Gitzlaff, Ian S. Wilbur, Chicago, IL, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Dalton Corporation ("Dalton") appeals from the Noble Superior Court's order granting summary judgment in favor of Transcontinental Insurance Co. ("Transcontinental") on the issue of whether Transcontinental was required to incur the costs to defend Dalton in a suit involving Dalton's alleged violations of the Clean Air Act. Because there was no potential for coverage under the insurance policy, we conclude that Transcontinental had no duty to defend Dalton. Therefore, we affirm.[1]

### Facts and Procedural History

This case involves the gray iron foundry in Kendallville, Indiana, built in the 1920s by the Newnam Family. In 1983, Amcast Industrial Corporation ("Amcast") bought the foundry. In 1984 and 1985, Amcast installed equipment at the foundry to make it more economically viable and safer to operate. These modifications consisted of updating the charge handling system to the cupola and replacing two mold lines

---

1. We held oral argument on this matter on June 27, 2007. We commend counsel for the quality of their written and oral advocacy.

and their associated sand handling equipment with one new mold line and its associated equipment. Amcast did not obtain any preconstruction permits from the Indiana Department of Environmental Management ("IDEM") before implementing these modifications.

On May 23, 1986, a citizen group called the Concerned Citizens of Noble County ("CCNC") presented a notice of intent to IDEM and the U.S. Environmental Protection Agency ("EPA") pursuant to 42 U.S.C. § 7604 of the Clean Air Act ("CAA") to file a lawsuit against Amcast. The CCNC alleged that Amcast modified its foundry without applying for or obtaining the preconstruction permits and/or operating permits required by the 1977 amendments to the CAA and Indiana law.

> In the Clean Air Act Amendments of 1977, Pub.L. 95–95, 91 Stat. 685, Congress enacted certain requirements applicable to States that had not achieved the national air quality standards established by the Environmental Protection Agency (EPA) pursuant to earlier legislation. The amended Clean Air Act required these "nonattainment" States to establish a permit program regulating "new or modified major stationary sources" of air pollution. Generally, a permit may not be issued for a new or modified major stationary source unless several stringent conditions are met.

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 839–840, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The 1977 amendments developed a new source review ("NSR") program. Under this program, new and modified sources of pollution are required to undergo a new source review, which is a permitting process that imposes specific pollution control requirements depending upon the geographic location of the source. Prevent Significant Deterioration permits ("PSD

permits") are required when a project is undertaken that significantly increases the facility's overall emissions. When a facility's project will result in emission increases, then the facility must install Best Available Control Technology ("BACT") to reduce the emissions.

Neither IDEM nor the EPA chose to initiate any action against Amcast based upon CCNC's notice of intent. However, on March 3, 1987, CCNC filed suit against Amcast, alleging violations of Indiana environmental laws and regulations, and specifically that the 1984–1985 modifications were made without the proper · permits. Amcast sold the foundry to its employees in 1988 in the midst of this controversy. The lawsuit was eventually settled on March 19, 1990, and dismissed with prejudice.

Amcast's employees then sold the foundry to Dalton in 1992. More than ten years later, on February 17, 2003, IDEM sent Dalton a Notice of Order for Submission of a PSD permit, regarding the 1984–1985 modifications to the foundry. IDEM's notice stated:

> The Office of Air Quality (OAQ) is presently drafting the Part 70 Permit for the gray iron foundry, located at 200 West Ohio Street, Kendallville, Indiana 46755. Information submitted by Dalton Foundry indicates that the Osborn mold line, the Osborn sand system, and the sprue and sand transport system were installed in 1984. The information also indicates that the cupola charge system was replaced and the cupola was physically modified in 1984. The OAQ's calculations, based on information submitted by The Dalton Foundries, Inc., indicate that in 1999 the actual emissions of particulate matter (PM), particulate matter with particle sizes under 10 micrometers (PM10), volatile organic compounds (VOC), carbon monoxide

(CO), sulfur dioxide ($SO_2$), and Beryllium (Be) from the 1984 modification exceeded the "Prevention of Significant Deterioration (PSD)" rule applicability thresholds.

Pursuant to 326 IAC 2–2, Dalton must apply for and obtain PSD permits for all of the emission units, which were part of the 1984 modification. Pursuant to 326 IAC 2–1.1–2(c), IDEM hereby orders that Dalton submit a PSD application for PM, PM10, VOC, CO, SO2 and Be for the cupola, cupola charge handling system, Osborn pouring, Osborn cooling, Osborn shakeout, Osborn sand handling, and the sprue and sand transport system within 90 days of Effective Date of this Notice of Order.

Appellant's App. p. 425.

After appealing IDEM's order in administrative proceedings, Dalton filed a complaint in Marion County seeking declaration that IDEM's 2003 Order requiring it to file a PSD permit was illegal and could not be enforced. On November 20, 2003, the Marion Superior Court granted Dalton's motion for summary judgment, finding that IDEM was barred from bringing an enforcement action on the grounds of res judicata, estoppel, and laches. IDEM did not appeal the trial court's order. Dalton incurred $156,820.83 in attorney's fees in its lawsuit, and it sought reimbursement for these expenses from its general liability insurance providers.

Dalton argues that its comprehensive general liability insurance providers, including Transcontinental, are liable for these attorney's fees because of their duty to "defend" Dalton in suits for damages. Transcontinental's commercial general liability coverage provides,

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insur-

ance applies. We will have the right and duty to defend any "suit" seeking those damages.

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2) The "bodily injury" or "property damage" occurs during the policy period.

Appellant's App. p. 143.

On December 10, 2003, Transcontinental and two other general liability insurers began this action, seeking a declaration as to whether they had an obligation to pay the attorney's fees. The other two general liability insurers settled with Dalton. On March 15, 2005, Dalton moved for summary judgment, and Transcontinental filed a cross-motion for summary judgment. The trial court heard oral argument on December 1, 2005. On January 26, 2006, it issued an order denying Dalton's motion for summary judgment and granting Transcontinental's cross-motion for summary judgment. Dalton now appeals.

### Standard of Review

The sole issue upon review is whether the trial court erred in granting Transcontinental's motion for summary judgment. Upon review of a grant or denial of summary judgment, we use the same standard of review as that used by the trial court. "Summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Bushong v. Williamson*, 790 N.E.2d 467, 473 (Ind. 2003) (citing Ind. Trial Rule 56(C)). All facts and reasonable inferences are construed in favor of the non-moving party, and our review is limited to those materi-

als designated to the trial court. *Id.* "The fact that the parties made cross-motions for summary judgment does not alter our standard of review. Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Hartford Accident & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 291 (Ind.Ct.App.1997), *trans. denied.*

 Insurance contracts are governed by the same rules of construction as other contracts, and the proper interpretation of an insurance policy, even if it is ambiguous, is generally a question of law appropriate for summary judgment. *Liberty Ins. Corp. v. Ferguson Steel Co., Inc.*, 812 N.E.2d 228, 230 (Ind.Ct.App.2004). If the policy language is clear and unambiguous it should be given its plain and ordinary meaning *Eli Lilly Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind.1985). An ambiguity does not exist simply because a controversy exists between the parties, each favoring an interpretation contrary to the other. *Linder v. Ticor Title Ins. Co. of Cal., Inc.*, 647 N.E.2d 37, 39 (Ind.Ct. App.1995). Under Indiana law, an insurance policy is ambiguous if reasonable persons may honestly differ as to the meaning of the policy language. *Id.* If the terms of a written contract are ambiguous, it is the responsibility of the trier-of-fact to ascertain the facts necessary to construe the contract. *Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 687 (Ind.Ct.App. 2006). Where there is ambiguity, insurance policies are to be construed strictly against the insurer. *Am. States Ins. Co. v. Kiger*, 662 N.E.2d 945, 947 (Ind.1996).

### Discussion

 This case involves deciding whether Dalton's lawsuit triggered Transcontinental's duty to defend under the general liability insurance contract.

An insurance company's duty to defend is broader than its duty to indemnify. The law in this jurisdiction is well settled that where an insurer's independent investigation of the facts underlying a complaint against its insured reveals a claim patently outside of the risks covered by the policy, the insurer may properly refuse to defend. However, an insurer refusing to defend must protect its interest by either filing a declaratory judgment action for a judicial determination of its obligations under the policy or hire independent counsel and defend its insured under a reservation of rights. As we have indicated, an insurer can refuse to defend or clarify its obligation by means of a declaratory judgment action. If it refuses to defend it does so at its peril.

*Walton v. First Am. Title Ins. Co.*, 844 N.E.2d 143, 146 (Ind.Ct.App.2006), *trans. denied* (internal citations and quotations omitted).

 Here, Transcontinental did not defend Dalton under a reservation of rights. Accordingly, we review whether Transcontinental now suffers the peril of its unilateral decision not to defend Dalton. We determine the insurer's duty to defend from the allegations contained within the complaint and from those facts known or ascertainable by the insurer after reasonable investigation. *Liberty Mut. Ins. Co. v. OSI Indus., Inc.*, 831 N.E.2d 192, 198 (Ind.Ct.App.2005), *trans. denied.* If the pleadings reveal that a claim is clearly excluded under the policy, then no defense is required. *Id.*

On appeal, Dalton maintains that it need not prove indemnity coverage to prevail on its claim against Transcontinental for defense costs. Rather, it must only demonstrate the *possibility* of indemnity coverage. Dalton maintains that there was a

potential for coverage of this suit[2] under the language of the policy, as it involved an occurrence that caused bodily injury or property damage for which Dalton could have been liable for damages. We examine each of these claims in turn, taking guidance from our supreme court's recent decision in *Cinergy Corp. v. Associated Electric & Gas Insurance Services Ltd.*, 865 N.E.2d 571 (Ind.2007).

## I. Occurrence

 Transcontinental's insurance policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Appellant's App. p. 151. "[I]n the context of insurance coverage, an accident means an unexpected happening without an intention or design." *Terre Haute First Nat. v. Pac. Employers Ins. Co.*, 634 N.E.2d 1336, 1338 (Ind.Ct. App.1993) (citing *Nat. Mut. Ins. Co. v. Eward*, 517 N.E.2d 95, 100 (Ind.Ct.App. 1987)).

> This description is consistent with the plain meaning of "accident," as indicated by the primary definition provided in several modern dictionaries: "1. an unintentional or unexpected happening that is undesirable or unfortunate, esp. one resulting in injury, damage, harm, or loss," THE RANDOM HOUSE COLLEGE DICTIONARY 9 (1984); "1. a: an unforeseen and unplanned event or circumstance b: lack of intention or necessity," WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 49 (1987); "1. An unexpected and undesirable event. 2. Something that occurs unexpectedly or unintentionally," THE

AMERICAN HERITAGE DICTIONARY 71 (2d ed.1985).
*Auto–Owners Ins. Co. v. Harvey*, 842 N.E.2d 1279, 1283 (Ind.2006).

Dalton contends that there was an "occurrence" because Dalton was unaware that it was emitting excess pollution into the air after Amcast had made modifications to the foundry in the 1980s. Transcontinental, on the other hand, characterizes this lawsuit as a dispute over whether Dalton was in compliance with Indiana law and operating under the proper permits. Transcontinental maintains that insurance policies are meant to indemnify the insured for accidental property damage, not accidental violations of the law. Br. of Appellee at 41.

On May 1, 2007, our supreme court decided *Cinergy Corp. v. Associated Electric & Gas Insurance Services, Ltd.*, 865 N.E.2d 571 (Ind.2007), which involved a similar claim for attorneys' fees. In *Cinergy*, the appellant-energy companies were sued by the United States, three states, and several environmental organizations pursuant to the CAA. As in the case at hand, in *Cinergy* the lawsuit filed against the power companies alleged their failure to obtain the proper permit for their excess emissions and sought installation of BACT to achieve lower emission rates. Cinergy's insurance policy covered bodily injury or property damage "caused by an occurrence." *Id.* at 574. Writing for a unanimous court, Justice Dickson stated,

> The clear and unmistakable import of the phrase "caused by" is that the accident, event, or exposure to conditions must have preceded the damages

---

**2.** In claiming that this environmental action falls under the definition of "suit," Dalton points to *Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285 (Ind.Ct.App.1997), *trans. denied*, where we held that coercive and adversarial administrative proceedings alleg-

ing liability are "suits," triggering a duty to defend. Transcontinental states in a footnote that for purposes of this appeal, it does not contest that administrative orders like the one at issue are "suits." Br. of Appellee at 19–20 n. 7.

claimed—here, the costs of installing emission control equipment. But what the power companies here claim to be covered, the installation costs for equipment to prevent future emissions, is not caused by the *happening* of an accident, event, or exposure to conditions but rather result from the *prevention* of such an occurrence. Notwithstanding our preference to construe ambiguous insurance policy language strictly and against the insurer, we discern no ambiguity here that would permit the occurrence requirement reasonably to be understood to allow coverage for damages in the form of installation costs for government-mandated equipment intended to reduce future emissions of pollutants and to prevent future environmental harm. . . . AEGIS is not thus responsible for the power companies' costs of defending claims or suits seeking to impose such liability.

*Id.* at 582–583 (emphasis in original).

Likewise, in the case at hand, IDEM's order sought the installation of BACT, or emission control equipment. This equipment was intended to reduce future emissions of pollutants, and therefore under the *Cinergy* precedent, its mandated installation is not a response to the happening of an "occurrence."

Dalton attempts to distinguish the *Cinergy* case by maintaining that Transcontinental has a broader duty to defend than the appellee in *Cinergy* because it is a primary insurance carrier with an express duty to defend while the insurer in *Cinergy* was merely an excess liability provider. However, in *Cinergy*, the excess liability policy stated that the insurer would be liable for "all expenses incurred by the insured in the investigation, negotiation, settlement and defense of any claim or suit seeking such damages." 865 N.E.2d at 575. Our supreme court interpreted this language to impose a "separate responsibility for defense costs for claims or suits seeking damages for occurrences that result in bodily injury or property damage." *Id.* at 577. Therefore, the insurer in *Cinergy,* like Transcontinental, had the same broad duty to defend as well as a direct pay responsibility for covered defense costs as incurred by the power companies. *Id.* at 578.

## II. Property Damage and Personal Injury

■ Transcontinental's policy defines property damage as:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence"

Appellant's App. p. 152. Notably, the use of this terminology in a comprehensive general liability policy is not a novel incident; rather, this is standard language for such policies in this country. *R.N. Thompson & Assoc., Inc. v. Monroe Guar. Ins. Co.,* 686 N.E.2d 160, 162 (Ind.Ct.App. 1997), *trans. denied.*

Dalton claims that the property damage was the damage caused to the air by its unlawful excess emissions. Dalton maintains that IDEM's order was a remedial action as the only way to remediate air pollution is by limiting further emissions. To support this contention, Dalton cites an opinion from the Iowa Supreme Court, which states in dicta that "[a]ir and navigable waters are, generally speaking, self-cleansing through time. Carbon monoxide in air and phosphates in water can thus be abated by limiting or eliminating present sources of pollution." *A.Y. McDonald In-*

*dus., Inc. v. Ins. Co. of N. Am.,* 475 N.W.2d 607, 612 (Iowa 1991).

Since a PSD permit is required if a facility's modification will result in a significant net increase in emissions, Dalton maintains that IDEM necessarily alleged that the foundry's modifications had caused a significant net increase in emissions when it issued its order requiring Dalton to retroactively apply for a preconstruction PSD permit. In other words, unlawful significant deterioration of the environment had already occurred as a result of the foundry's failure to obtain the proper permit before undergoing modifications in the 1980s. Br. of Appellant at 25. Dalton maintains that IDEM highlighted the damage to the air quality in its brief by stating that "the real losers are the citizens of Noble County who must endure substandard air." Appellant's App. p. 441.

In *Cinergy*, our supreme court refuted this same claim. In discussing property damages, the court noted,

> Notwithstanding the federal lawsuit's various references to seeking relief that would "remedy" past violations and harm to public health, the power companies acknowledge that the injunctive remedy sought by the federal lawsuit is "to force Cinergy to install equipment to contain any further excess emissions and allow the environment to recover." The federal lawsuit is directed at preventing future public harm, not at obtaining control, mitigation, or compensation for past or existing environmentally hazardous emissions.

*Cinergy*, 865 N.E.2d at 582.

▇ In the alternative, Dalton maintains that Transcontinental's duty to defend was triggered by the separate coverage provision specifying that Transcontinental has a "duty to defend any 'suit' seeking" damages "because of 'personal injury.'" Appellant's App. p.

145. Transcontinental's policy defines "personal injury" as "an injury other than 'bodily injury,' arising out of ... [t]he wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor." *Id.* at 151.

In *Allstate Insurance Company v. Dana Corp.*, 759 N.E.2d 1049, 1056 (Ind.2001) ("Dana II"), our supreme court held that "wrongful eviction" and the "invasion of the rights of privacy" do not encompass the entry of contaminants onto one's property unless the situation involves a tenant being compelled to vacate its location because of environmental damage. *Id.* at 1056 (quotation and citation omitted). The rationale behind this holding was that the entrants of contaminants onto one's property, while a physical tort, could not be classified as an invasion of rights to privacy as it had "no component of disrupting an individual's repose." *Id.* at 1057. There has been no such allegation of compelled vacation of premises in the case at hand.

Nonetheless, Dalton claims that it can recover under the "wrongful entry" provision of Transcontinental's policy. Because in *Dana II* Allstate did not challenge the trial court's ruling that the contamination constituted "wrongful entry," the supreme court "express[ed] no opinion as to [that issue]." *Id.* Therefore, Dalton contends that the coverage provided for under the term "wrongful entry" is governed by the precedent set forth in *Travelers Indemnity Company v. Summit Corp. of America,* 715 N.E.2d 926, 937 (Ind.Ct.App.1999). In *Summit*, the policyholder asserted that chemicals it had released into the soil and groundwater constituted a wrongful entry under the insurance contract's definition of personal injury. The claims in *Summit*

involved "land owned by Summit, land owned by others to which Summit sent waste, and groundwater at those sites." *Id.* at 937. As an issue of first impression, our court concluded that a policyholder's release of contaminants onto others' property could be construed as a wrongful entry under the ambiguous language of the policy. *Id.*

However, IDEM's order requiring application of a PSD permit did not allege wrongful entry or any offense against other property owners. In *Summit*, the claims against the policyholder involved contamination of other people's or entities' land. *Id.* Here, there has been no specific allegation that Dalton's excess emissions have contaminated another person's land or interfered with the enjoyment of such land, and therefore there can be no coverage under the "personal injury" provision of the policy.

### III. Liability for Damages

■ Because Transcontinental's policy does not define the term "damages," we are left to interpreting its meaning as controlled by state law. At issue is whether IDEM's 2003 notice of order for submission of a PSD application for the foundry constituted a suit for damages. The order stated, in relevant part,

> Pursuant to 326 IAC 202, Dalton must apply for and obtain PSD permits for all of the emission units, which were part of the 1984 modification. Pursuant to 326 IAC 2–1.1–2(c), IDEM hereby orders that Dalton submit a PSD application for PM, PM10, VOC, CO, SO2 and Be for the cupola, cupola charge handling system, Osborn pouring, Osborn cooling, Osborn shakeout, Osborn sand handling, and the sprue and sand transport system within 90 days of Effective Date of this Notice of Order.

Appellant's App. p. 425.

Dalton concedes that under the precedent set forth in *Cinergy,* the cost of installing government mandated equipment intended to reduce future emissions does not constitute damages. Supplement Br. of Appellant at 2. However, Dalton maintains that the *Cinergy* opinion leaves open the possibility that other forms of PSD relief could be covered under a general liability policy. Therefore, Dalton contends that because there is a possibility of coverage, Transcontinental's duty to defend was triggered. We disagree.

IDEM did not seek any other relief in its order besides the application of a permit to determine whether BACT needed to be installed. "In Indiana, it is well settled that an insurer's duty to defend is determined by the allegations of the complaint coupled with those facts known to or ascertainable by the insurer after a reasonable investigation." *Cincinnati Ins. Co. v. Mallon,* 409 N.E.2d 1100, 1106–07 (Ind.Ct. App.1980) (citing *Am. States Ins. Co. v. Aetna Life & Cas. Co.,* 177 Ind.App. 299, 379 N.E.2d 510 (1978)). Consequently, because no other relief was sought besides the potential installation of BACT, Dalton was not liable for "damages" as defined by Transcontinental's insurance policy.

### Conclusion

For the foregoing reasons, we conclude that the facts and circumstances at issue were not an occurrence that caused bodily injury, property damage, or personal injury for which Dalton could have been liable for damages. Because there was no potential for coverage under the policy, Dalton's lawsuit did not trigger Transcontinental's duty to defend.

Affirmed.

NAJAM, J., and SULLIVAN, Sr. J., concur.