

FILED
Aug 02 2013, 6:27 am

CLERK
of the supreme court,
court of appeals and
tax court

## FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**LAURA S. REED**
Riley, Bennett & Egloff, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**GEORGE M. PLEWS**
**KAREN B. SCHEIDLER**
Plews Shadley Racher & Braun, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

NORTHERN ASSURANCE COMPANY OF )
AMERICA, AS SUCCESSOR IN INTEREST )
TO CERTAIN LIABILITIES OF EMPLOYERS )
SURPLUS LINES INSURANCE COMPANY )
)
    Appellant-Defendant, )
)
       vs. )    No. 49A04-1208-PL-400
)
THOMSON INC. k/n/a TECHNICOLOR, )
USA, INC., TECHNICOLOR INC., and )
TECHNICOLOR LIMITED )
)
    Appellees-Plaintiffs. )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Michael D. Keele, Judge
Cause No. 49D07-0807-PL-30746

**August 2, 2013**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Thomson, Inc. n/k/a Technicolor USA Inc. ("Technicolor"), sued several insurance companies, including Northern Assurance Co. of America (the successor in interest to Employers Surplus Lines Insurance Co. ("ESLIC")), seeking insurance coverage for environmental damages at three sites owned by Technicolor. The trial court granted summary judgment in favor of Technicolor, concluding that Technicolor was entitled to coverage under the policies ESLIC had issued. On appeal, ESLIC argues that the trial court should have applied California law when interpreting the ESLIC policies and that, if California law is applied, Technicolor has no coverage under the ESLIC policies for cleanup costs at the contaminated sites because Technicolor's cleanup costs do not constitute damages resulting from a suit brought against Technicolor.

We reverse and remand.

**Facts and Procedural History**

A. *The Parties*

Thomson, Inc. ("Thomson") is a corporation with long-established ties to Indiana. Technicolor was a California-based corporation that had a U.K.-based subsidiary known as Technicolor Limited ("UK Technicolor"). Both Technicolor corporations were later acquired by Thomson, which later changed its name to Technicolor USA, Inc. For purposes of the current litigation, the parties refer to Thomson/Technicolor as "Technicolor." ESLIC was an insurance company subsequently acquired by Northern Assurance Co. of America. Although Northern Assurance is the named party in the current litigation, as the successor in interest to ESLIC, the parties refer to the insurer in this case as "ESLIC." We will do likewise.

2

B. *The Policies*

From 1961 to 1969, ESLIC sold three first-level excess policies to the insureds "Technicolor Inc. and its wholly owned subsidiaries as they are now or may be hereinafter constituted" and "Technicolor Corporation, Technicolor New York Corporation and Any Subsidiary or Propriety Corporation Thereof, Now Existing Assured or Which May Hereafter Exist." Appellant's App. pp. 422, 431. The policies, which will be referred to as the "ESLIC policies," provided in part:

> THIS INSURANCE, to the extent and in the manner hereinafter provided, is to pay on behalf of the Assured all sums which the Assured shall become legally obligated to pay, or by final judgment be adjudged to pay, to any person or persons as damages
>
> * * *
>
> (b) for damage to or destruction of the property of others, including the loss of use thereof (hereinafter referred to as "Property Damage")
>
> caused by an accident occurring during the period mentioned in the Schedule and arising out of such hazards as are set forth in Item 4 of the Schedule and which are also covered by and defined in the policy/ies specified in the Schedule and issued by the "Primary Insurer" stated therein,
>
> PROVIDED ALWAYS THAT: —
>
> (a) Liability attaches to the Underwriters only in respect of such hazards as are set forth in Item 4 of the Schedule and only for such coverages and limits against which an amount is inserted in Item 8(b) or 8(c) of the Schedule and then only after the Primary and Underlying Excess Insurers have paid or have been held liable to pay the full amount of their respective **ultimate net loss liability** as set forth in the Schedule in Item 8 and designated the "Primary and Underlying Excess Limit(s)" and then
>
>> (i)   the limits of the Underwriters' liability will be such amount or **ultimate net loss** as will provide the Assured with total limits under the policy/ies of the Primary and Underlying Excess Insurers and this Insurance combined as set forth in Item 8(b) of the Schedule under the designation "Total Limit(s)" or
>>
>> (ii)   if it is not practicable to set forth in Item 8(b) of the Schedule the Total Limit(s) of liability under this Insurance and all underlying polices combined then the limits of the Underwriters' liability shall be those set forth in Item 8(c) under the designation

3

"Excess Limit(s)" and the Underwriters shall be liable to pay **the ultimate net loss** up to the full amount of such Excess Limit(s).

\* \* \*

(c)  Liability for Property Damage is subject to the limit "Each Accident" as stated in the Schedule, but as regards Products Liability and any hazard insured with an aggregate limit under the policy/ies of the Primary Insurer liability shall not exceed in any one policy year in respect of each such hazard the limit of liability stated as "Aggregate" in the Schedule.

(d)  Neither the inclusion of more than one entity in the name of the Assured nor the addition of any additional Assureds under this Insurance shall in any way operate to increase the Underwriters' limits of liability in respect of any one person/accident/aggregate beyond those provided for in Item 8 (Limits of Liability) of the Schedule.

\* \* \*

## DEFINITIONS

(a)  ACCIDENT.—The word "accident" shall be understood to mean an accident or series of accidents arising out of one event or occurrence.

(b)  **ULTIMATE NET LOSS**.— The words **"ultimate net loss"** shall be understood to mean the amount payable in settlement of the liability of the Assured after making deductions for all recoveries and for other valid and collectible insurances, excepting however the policy/ies of the Primary and Underlying Excess Insurers, and shall exclude all expenses and Costs.

\* \* \*

Said insurance is made and accepted subject to the foregoing stipulations and conditions, and to the stipulations and conditions printed on the back hereof, which are herby made a part of said insurance, together with such other provisions, stipulations and conditions as may be endorsed on said Certificate of Insurance or added thereto as therein provided.

## CONDITIONS

\* \* \*

4.  ATTACHMENT OF LIABILITY.—Liability to pay under this Insurance shall not attach unless and until the Primary and Underlying Excess Insurers shall have admitted liability for the Primary and Underlying Excess Limit(s) or unless and until the Assured has by final judgment been adjudged to pay an amount which exceeds such Primary and Underlying Excess Limit(s) and then only after the Primary and Underlying Excess

> Insurers have paid or have been held liable to pay the full amount of the Primary and Underlying Excess Limit(s).

Id. at 438-39, 449-50, 466-67 (bold emphasis added). Notably, there are no pollution exclusions in the ESLIC policies. The policies were procured through Marsh and McLennan-Cosgrove & Co., in California, issued through Sayre & Toso Underwriting Managers in California, to what was then California-based Technicolor.

C. *The Technicolor Sites*

Technicolor is seeking coverage for environmental cleanup costs at three sites. The first of these sites is located in Los Angeles, California and was originally owned and operated by Consolidated Film Industries ("CFI"). CFI processed, duplicated, and printed film at this site from 1924 to 2002. Chemicals used at the CFI site included industrial solvents. Technicolor purchased the CFI business in 2000. In 2004, soil testing at the CFI site revealed contamination from the chemicals used at the site, requiring Technicolor to begin cleanup at the site.

The second site involved in the present case is located on Lankershim Boulevard in North Hollywood, California. Technicolor provided processing, printing, and duplication services at this site from 1964 to 2011. Like the CFI site, chemicals used in these processes were leaked and spilled during the operation of the site, resulting in environmental contamination that has required cleanup.

The last site involved is located in West Drayton, England in the United Kingdom. UK Technicolor operated film processing services at this site from 1935 to 2009. Again,

5

chemicals used in this processing were leaked and spilled, resulting in soil and groundwater contamination, requiring extensive and expensive cleanup.[1]

D. *The Current Litigation*

As a result of the contamination at the sites and the cleanup costs, Technicolor brought suit against numerous insurance companies seeking coverage for those cleanup costs. Among the insurers were ESLIC and Continental Casualty Co. ("Continental").

Technicolor moved for summary judgment against Continental seeking a declaration of coverage for the cleanup at the sites. Continental filed a cross-motion for summary judgment, arguing that, under California law, its umbrella policies did not provide coverage. Thomson Inc. v. Continental Cas. Co., 982 N.E.2d 4, 6 (Ind. Ct. App. 2012), trans. denied ("Thomson I"). The trial court granted summary judgment in favor of Continental, finding that, under California law, the umbrella policy "damages" were limited to those as a result of courtroom litigation and did not provide coverage for costs and expenses Technicolor incurred in response to "administrative directives to remedy environmental contamination." Id. at 5, 6.

On appeal in that case, the parties agreed that California insurance law governed the merits of the appeal and that remediation was being done pursuant to the directive of local environmental agencies. Id. Still, Technicolor argued that coverage existed under the umbrella policies under the definition of "ultimate net loss." Id. This court held:

> Under California insurance law, as it relates to commercial general liability policies, "damages" are limited to losses resulting from a "suit," which is understood to refer, in general, to courtroom litigation. [T]he duty to

---

[1] Technicolor notes in its brief that "past costs at the U.K. site exceed $1.3 million." Appellant's Br. p. 9.

defend a "suit" seeking "damages" under pre–1986 CGL policies is restricted to civil actions prosecuted in a court, initiated by the filing of a complaint, and does not include claims, which can denote proceedings conducted by administrative agencies under environmental statutes. Likewise, the duty to indemnify for "'all sums that the insured becomes legally obligated to pay as damages'" ([Certain Underwriters at Lloyd's of London v. Superior Court, 16 P.3d 94, 105 (2001)]) in the same standard primary policies is limited to money ordered by a court, and does not include expenses such as may be incurred in responding to administrative agency orders. CDM Investors v. Travelers Cas. & Sur. Co., 43 Cal.Rptr.3d 669, 674 (2006). Consequently, unless the Umbrella Policy provides coverage for proceedings beyond "suits" or for indemnity for losses beyond "damages," there is no coverage under California law. Thomson argues that the policy's definition of "ultimate net loss" expands the general definition of "damages," while Continental argues that the California Court of Appeal has already addressed and rejected this precise argument in CDM Investors.

Thomson I, 982 N.E.2d at 7-8.

The Thomson I court agreed with Continental, noting that the coverage language in the Continental umbrella policy provided that the insurer would "indemnify the insured . . . for ultimate net loss . . . which the insured shall become obligated to pay *as damages*[.]" Id. at 9 (emphasis in original). Thus, the policy limited the "ultimate net loss" to "damages." Id. And since "damages" were limited to those ordered by a court in a civil action, there was no coverage for the cleanup costs incurred by Technicolor in response to the directives of the local environmental agencies. Id.

In the meantime, in the instant case, on August 15, 2011, ESLIC moved for summary judgment, claiming that, irrespective of which state's law applied, there was no coverage because there were no accidents causing property damage at the sites during the ESLIC policy periods. Technicolor then filed a cross-motion for summary judgment on December 7, 2011, claiming that, under Indiana law, there had been accidents resulting in

7

property damage at the sites during the time of the ESLIC policies. In its reply, ESLIC then argued that California law should be applied when interpreting the ESLIC policies and that, under California law, there was no coverage. On July 10, 2012, the trial court issued its order on the parties' cross-motions for summary judgment, concluding:

> Having reviewed the parties' submissions and being duly advised, the Court now GRANTS Technicolor's motion for partial summary judgment and DENIES ESLIC's motion. ESLIC's motion to strike Technicolor's expert opinions is DENIED as ESLIC's assertion of a conflict between the expert opinions and the deposition testimony is unsupported by the designated evidence. In addition, ESLIC's designated deposition testimony relates only to the U.K. Site and cannot serve as a basis to strike the reports on the Lankershim or CFI Sites. The amount of coverage proceeds owed by ESLIC under the Excess Policies for the Lankershim, CFI and U.K. Sites is reserved for further proceedings.

Appellant's App. p. 69. ESLIC now appeals.

**Standard of Review**

Upon review of a grant or denial of summary judgment, we apply the same standard as that used by the trial court: summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Newman Mfg., Inc. v. Transco. Ins. Co., 871 N.E.2d 396, 400 (Ind. Ct. App. 2007) (citing Ind. Trial Rule 56(C)). We construe all facts and reasonable inferences in favor of the non-moving party, and our review is limited to those materials designated to the trial court. Id. at 400-01. The fact that the parties made cross-motions for summary judgment does not alter our standard of review; rather, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. Id. at 401.

## I. Choice of Law

The main argument between the parties is whether the trial court erred in applying Indiana law when interpreting the ESLIC policies. Specifically, ESLIC argues that the trial court erred when it did not apply California law to interpret the ESLIC policies, setting forth several reasons why it claims that California law should have been applied.

A. *Technicolor's Initial Claims of Waiver and Failure to Designate Evidence*

Technicolor responds by first arguing that ESLIC has waived this argument by failing to present it to the trial court in ESLIC's motion for summary judgment. Technicolor correctly notes the general rule that an issue not presented to the trial court may not be presented for the first time on appeal. See Commitment of T.S. v. Logansport State Hosp., 959 N.E.2d 855, 857 (Ind. Ct. App. 2011) ("a party may not present an argument or issue to an appellate court unless the party raised that argument or issue to the trial court."), trans. denied. Here, however, ESLIC claimed in its motion for summary judgment that there was no conflict of law between California and Indiana on the issue on which its motion was based. It then specifically noted that, if Technicolor based its argument on an issue on which there was a conflict of law, it reserved the right to argue that California law should apply. Then, in its response to Technicolor's cross-motion for summary judgment, ESLIC specifically argued that California law should apply. Under these facts and circumstances, we are unable to conclude that ESLIC waived its argument regarding the choice-of-law issue.

Technicolor also claims that ESLIC cannot prevail on its choice-of-law argument because ESLIC failed to designate any evidence to the trial court that would support the

9

analysis required to determine which state's law should apply. ESLIC does not directly deny this; instead, it claims that its choice-of-law argument is supported by evidence that was already designated to the trial court, albeit by other parties. ESLIC claims that it can rely on evidence designated by Technicolor itself and ESLIC's co-defendant Continental. We agree.

It is well settled that a party may rely on evidence designated by an opposing party. Filip v. Block, 879 N.E.2d 1076, 1081 (Ind. 2008); AutoXchange.com, Inc. v. Dreyer & Reinbold, Inc., 816 N.E.2d 40, 46 (Ind. Ct. App. 2004) ("Once evidence has been designated to the trial court by one party, that evidence is deemed designated and the opposing party need not designate the same evidence."). We think the same is true with regard to evidence designated by a co-defendant. Once Continental had designated evidence in support of its motion for summary judgment, it was deemed designated and brought to the attention of the trial court, and it was not necessary for ESLIC to re-designate the same evidence.

Turning now to the merits of the choice-of-law question, ESLIC presents several arguments in support of its claim that California law should apply to the question of whether Technicolor's cleanup costs are covered as damages under the ESLIC policies.

B. *Law of the Case*

ESLIC first argues that the law-of-the-case doctrine required the trial court to apply California law. The law-of-the-case doctrine is a discretionary rule that expresses the practice of courts to refuse to reopen what has previously been decided. Miller v. Owens, 953 N.E.2d 1079, 1082 (Ind. Ct. App. 2011), trans. denied. In general, facts that

10

are established at one stage of a proceeding, which were part of an issue on which judgment was entered and appeal taken, are unalterably and finally established as part of the law of the case and may not be re-litigated at a subsequent stage. Id. Even if a judgment is erroneous, it nevertheless becomes the law of the case and thereafter binds the parties unless successfully challenged on appeal. Id. All issues decided directly or by implication in a prior decision are binding in all further portions of the same case. Id. As explained by our supreme court:

> The doctrine of the law of the case is a discretionary tool by which appellate courts decline to revisit legal issues already determined on appeal in the same case and on substantially the same facts. The purpose of this doctrine is to promote finality and judicial economy. The doctrine of the law of the case is applied only to those issues actually considered and decided on appeal.

Cutter v. State, 725 N.E.2d 401, 405 (Ind. 2000) (citations and internal quotations omitted). But questions that were not conclusively decided in a prior appeal do not become the law of the case. Id. (quoting Riggs v. Burell, 619 N.E.2d 562, 564 (Ind. 1993)).

In this case, ESLIC argues that the law-of-the-case doctrine requires that the courts apply California law, referring to the trial court's earlier judgment in favor of Continental in this case, which we affirmed on appeal. See Thomson I, 982 N.E.2d at 6. In Thomson I, the trial court wrote, "Though their reasons differ, Technicolor and Continental agree that the Court must decide the availability of coverage under the Umbrella Policy under California coverage law." Appellant's App. p. 691. Similarly, on appeal, this court noted that "[b]oth parties agree that California law governs the merits

11

of this appeal[.]" Thomson I, 982 N.E.2d at 7. ESLIC argues that this is now the law of the case and that the trial court erred in concluding that Indiana law should apply to the interpretation of the ESLIC policies.

Technicolor argues that ESLIC's reliance on the law-of-the-case doctrine is misplaced. Specifically, Technicolor claims that the earlier appeal arising out of the present action filed by Technicolor, the Thomson I case, has no bearing on the present appeal because: (1) the Thomson I court did not decide any choice-of-law issue, and (2) the Thomson I court considered only the language of the Continental umbrella policy, *not* the ESLIC excess policies at issue in the present case. On this issue, we agree with Technicolor.

The Thomson I court did not actually decide any choice-of-law issue. Instead, as stated above, the court simply noted that the parties to that appeal, both Technicolor and Continental, *agreed* that California law should apply. See Thomson I, 982 N.E.2d at 7 ("[b]oth parties agree that California law governs the merits of this appeal[.]"). The same is true for the trial court's order regarding the Continental policy—it simply noted that the parties agreed that California law applied. See Appellant's App. p. 691. Because the Thomson I court did not actually decide a choice of law issue, the law-of-the-case doctrine does not apply to the present case.

C. *Judicial Estoppel*

ESLIC also claims that Technicolor is judicially estopped from asserting that Indiana law applies. Judicial estoppel is a judicially-created doctrine that prevents a party from asserting a position that is inconsistent with one asserted by that party in the same or

12

a previous proceeding. <u>Morgan Cnty. Hosp. v. Upham</u>, 884 N.E.2d 275, 280 (Ind. Ct. App. 2008). This doctrine is not intended to eliminate all inconsistencies; instead, it is designed to prevent litigants from playing "fast and loose" with the courts. <u>Id</u>. The primary purpose of judicial estoppel is to protect the integrity of the judiciary, not protect litigants. <u>Id</u>. Thus, absent a good explanation, a party should not be permitted to gain an advantage by litigating on one theory and then subsequently pursue an incompatible theory. <u>Id</u>. Judicial estoppel only applies to *intentional* misrepresentation, so the dispositive issue supporting the application of judicial estoppel is the bad-faith intent of the litigant subject to estoppel. <u>Id</u>.

ESLIC notes that in Technicolor's reply in support of its motion for summary judgment against Continental, Technicolor wrote, "[u]nder the facts of this case, *where California law now governs* and legal pressures other than courtroom litigation were applied by the agencies to force the necessary cleanups, no 'damages' covered by the [Continental] Primary Policies have resulted from the covered 'occurrences.'" Appellant's App. p. 347 (emphasis added). ESLIC claims it relied upon these prior admissions made by Technicolor, and that Technicolor should now be estopped from arguing that California law does not apply.

Technicolor acknowledges that it did make a "concession" in its brief regarding Continental's umbrella policy by stating that it would not appeal the California court's determination of coverage under Continental's primary policy. But it claims that this does not establish judicial estoppel because judicial estoppel requires "a prior position and decision on a contested issue." Appellee's Br. at 29. Technicolor again notes that, in

both the trial court and on appeal in the Thomson I case, the parties *agreed* that California law applied.

Again, we agree with Technicolor that, because the choice-of-law issue was not contested, decided, or essential to any decision in the Thomson I case, judicial estoppel should not apply. See Wabash Grain, Inc. v. Smith, 700 N.E.2d 234, 237 (Ind. Ct. App. 1998) (noting that for judicial estoppel to apply the allegations or admissions must have, at least, been acted on by the court in which the pleadings were filed or by the parties claiming the estoppel).

D. *Choice-of-Law on its Merits*

ESLIC also argues that, even if the law-of-the-case doctrine and judicial estoppel do not prevent Technicolor from arguing that Indiana law should apply to the present case, California law should still be applied under a standard choice-of-law analysis. Here, because this suit was filed in Indiana, Indiana choice-of-law rules apply. Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Standard Fusee Corp., 940 N.E.2d 810, 813 (Ind. 2010).

Our supreme court has addressed the choice-of-law issue in environmental insurance cases, noting that such cases involve "frequently recurring disputes over insurers' obligations to defend and indemnify their insureds in the face of demands to clean up or pay for environmental contamination at multiple sites in multiple states." Nat'l Union, 940 N.E.2d at 812. The core of this case is the interpretation to be accorded certain contractual language contained in the insurance policies. See id. at 812-13. "Predicate to that interpretation is determining applicable law." Id. at 813. Our supreme court noted that:

14

Courts faced with these cases have generally addressed choice-of-law issues in one of two ways—either by what is called a "uniform-contract-interpretation" approach or by a "site-specific" approach. The uniform-contract-interpretation approach applies the law of a single state to the whole contract even though it covers multiple risks in multiple states; the site-specific approach applies the law of the state or states where the insured risks are located, unless another state has a more significant relationship to the particular issue.

Id. at 813 (citations omitted). In National Union, our supreme court adopted the "uniform-contract interpretation" approach, as this court had also traditionally done. Id. at 813, 815.

Since 1945, Indiana has used the following choice-of-law rule in contract cases: "'The court will consider all acts of the parties touching the transaction in relation to the several states involved and will apply as the law governing the transaction the law of that state with which the facts are in most intimate contact.'" Id. at 814 (quoting W.H. Barber Co. v. Hughes, 223 Ind. 570, 586, 63 N.E.2d 417, 423 (1945)). This "most intimate contact" rule is consistent with the approach taken by the Restatement (Second) of Conflict of Laws (1971).[2] Nat'l Union, 940 N.E.2d at 814. Section 188 of the Restatement provides that the laws of the state with the "most significant relationship to the transaction and the parties" should be applied. Id. In determining that relationship, the Restatement considers certain contacts:

(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. Indeed, the factors provided in this section have guided our courts in determining the state in most intimate contact; Restatement (Second) section 193, to which subsection (3) of

---

[2] Indeed, the Reporter's notes of Section 188 of the Restatement cite to W.H. Barber. See id.

> section 188 defers, has further guided our courts' consideration of the subject matter of the contract. Accordingly, [the Indiana Supreme] Court has recognized that [a]n insurance policy is governed by the law of the principal location of the insured risk during the term of the policy. Thus, when we have considered the state in most intimate contact in insurance contract cases, we have looked first to the principal location of the insured risk.

Id. (citing Restatement (Second) of Conflict of Law §§ 188, 193). If the principal location of the insured risk can be determined, it is given more weight than other factors. Id. at 816. But if no such location exists, we continue our analysis of the most intimate contacts. Id.

ESLIC argues that, applying these factors leads to the conclusion that California has the most intimate contact with the ESLIC policies and that California law should apply. We agree.

It is undisputed that two of the three pollution sites at issue are located in California. Thus, at least with regard to the policies involving those sites, the "principal location of the risk" is in California, as is the subject matter of the policies. Indeed, it is undisputed that the cleanup at the two California sites was directed by the California state Environmental Protection Agency. Moreover, *all* of the ESLIC policies were issued to Technicolor at a California address, and the broker involved in procuring the policies was listed on the policy documentation as a Los Angeles, California broker.

The only connection with Indiana that these policies have is that Thomson, a corporation with long-established ties to Indiana, acquired Technicolor's assets in 2000, decades after the policies were issued and years after most of the alleged pollution would have occurred. Although Technicolor also operated at the U.K. site and ESLIC was a

16

Delaware corporation with its principal office located in that state, we conclude that the state with the "most significant relationship to the transaction and the parties" is California, not Indiana, and the laws of California should be applied. See National Union, 940 N.E.2d at 814.

## II. Coverage

Having concluded that California law should be applied when interpreting the ESLIC policies, we now turn to the question of whether the policies provide coverage for Technicolor's cleanup costs at the sites. Under California law:

> While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. Such intent is to be inferred, if possible, solely from the written provisions of the contract. If contractual language is clear and explicit, it governs.
> A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. The fact that a term is not defined in the policies does not make it ambiguous. Nor does disagreement concerning the meaning of a phrase or the fact that a word or phrase isolated from its context is susceptible of more than one meaning. Language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract. If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.

Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co., 959 P.2d 265, 272-73 (Cal. 1998) (citations and internal quotations omitted); see also Wallman v. Suddock, 134 Cal. Rptr. 3d 566, 578 (Cal. Ct. App. 2011) (following Foster-Gardner).

Here, the relevant language in the ESLIC policies provides:

17

THIS INSURANCE, to the extent and in the manner hereinafter provided, is to pay on behalf of the Assured all sums which the Assured shall become legally obligated to pay, or by final judgment be adjudged to pay, to any person or persons as damages . . . (b) *for damage to or destruction of the property of others*, including the loss of use thereof (hereinafter referred to as "Property Damage") caused by an accident occurring during the period mentioned in the Schedule[.]

Appellant's App. pp. 438, 449, 466 (emphasis added).

In Thomson I, we applied California law to policy language that was similar to this. In that case, the policy language at issue provided:

The company will indemnify the insured with respect to any occurrence not covered by underlying insurance, or with respect to *damages* not covered by underlying insurance but which results from an occurrence covered by underlying insurance, *for ultimate net loss* in excess of the insured's retained limit which the insured shall become obligated to pay *as damages* by reason of liability imposed upon the insured by law or assumed by the insured under any contract because of . . . personal injury . . . property damage, or . . . advertising injury . . . to which this coverage applies caused by an occurrence. . . .

\* \* \*

"ultimate net loss" means the sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the insured is legally liable after making deductions for all other recoveries ... and also includes investigation, adjustment, appraisal, appeal and defense costs paid or incurred by the insured with respect to damages covered hereunder.

982 N.E.2d. at 6 (emphasis added). Addressing this issue under California law, we held that Continental's policies provided coverage for "all sums or ultimate net loss that the insured becomes legally obligated to pay as damages," and that, under California law, this was limited to money damages ordered by a court and not expenses incurred by responding to the orders of an administrative environmental agency. Thomson I, 982 N.E.2d at 8.

18

In so holding, we relied upon CDM Investors v. Travelers Cas. & Sur. Co., 43 Cal. Rptr. 3d 669 (Cal. Ct. App. 2006). In that case, the policy language at issue provided: "The company will pay . . . the ultimate net loss . . . which the insured shall become legally obligated to pay . . . as damages." Id. at 677. The California Court of Appeals held that "the duty to defend a 'suit' seeking 'damages' under pre-1986 CGL policies is restricted to civil actions prosecuted in a court, initiated by the filing of a complaint, and does not include *claims*, which can denote proceedings conducted by administrative agencies under environmental statutes." Id. at 674 (citing Foster-Gardner, Inc., 959 P.2d at 274). The CDM Investors court further held that the duty to indemnify the insured for "'all sums that the insured becomes legally obligated to pay as damages'" was "limited to money ordered by a court," and "d[id] not include expenses such as may be incurred in responding to administrative agency orders." Id.

The same is true in the case before us. Here the ESLIC policies provide coverage for "all sums which the Assured shall become legally obligated to pay, or by final judgment be adjudged to pay, to any person or persons as damages . . . for damage to or destruction of the property of others[.]" Appellant's App. pp. 438, 449, 466. Although not identical to the language in either Thomson I or CDM Investors, the ESLIC policies provide coverage only for sums Technicolor becomes legally obligated to pay, or by final judgment be adjudged to pay, as *damages* for damage to or destruction of the property of others. As explained in CDM Investors, under California law, such "damages" are limited to money damages ordered by a court and do not include expenses incurred as a

19

result of responding to the cleanup orders of an administrative agency. 43 Cal. Rptr. 3d at 674.

We note here that we do not agree with the position California law takes on this matter. In fact, we agree with the arguments Technicolor made at oral argument that it is a waste of resources to require an insured to fight an administrative order in court in order to receive coverage under an insurance policy. Indeed, this court has formally come to this conclusion when applying Indiana law. See Hartford Acc. & Indem. Co. v. Dana Corp., 690 N.E.2d 285, 298 (Ind. Ct. App. 1997) ("We hold that the ordinary meaning of the term 'damages' in a CGL policy includes EPA or state-mandated cleanup and response costs."). However, under choice-of-law principles, it is our duty to apply California law to the policy language at issue.

## Conclusion

We conclude that ESLIC did not waive its choice-of-law argument. We also conclude that, under a choice-of-law analysis, California law should apply to the interpretation of the ESLIC policies because California is the state with the most significant relationship to the transaction and the parties. Finally, under California law, the ESLIC policies provide coverage only for money damages ordered by a court and do provide coverage for expenses incurred as a result of responding to the cleanup orders of administrative agencies. We therefore reverse the order of the trial court granting summary judgment in favor of Technicolor and remand with instructions to enter summary judgment in favor of ESLIC.

Reversed and remanded.

20

MAY, J., concurs.

BAKER, J., concurs in part and dissents in part with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

NORTHERN ASSURANCE COMPANY OF )
AMERICA, AS SUCCESSOR IN INTEREST )
TO CERTAIN LIABILITIES OF EMPLOYERS )
SURPLUS LINES INSURANCE COMPANY )
                                    )
    Appellant-Defendant, )
                                    )
        vs. )      No.  49A04-1208-PL-400
                                    )
THOMSON INC. k/n/a TECHNICOLOR, )
USA, INC., TECHNICOLOR INC., and )
TECHNICOLOR LIMITED )
                                    )
    Appellees-Plaintiffs. )

**BAKER, Judge, concurring in part and dissenting in part.**

I concur with the majority's conclusions that ESLIC did not waive its choice-of law argument and that under a choice-of-law analysis, California law applies. However, I part ways with the majority's application of California law, trusting that if our environmentally-conscious colleagues to the west were confronted with this issue, they would no longer permit their environment to go uncleansed.

To begin, Congress passed The Federal Comprehensive Environmental Responsibility, Compensation, and Liability Act of 1980 (CERCLA) to facilitate the prompt cleanup of hazardous waste sites. Cnty. of Santa Clara v. U.S. Fidelity & Guar. Co., 868 F. Supp. 274, 279 (N.D. Cal. 1994).  Likewise, the Hazardous Substance

22

Account Act (HSAA),[3] California's version of CERCLA, incorporates many of the same ideas as CERCLA. For instance, upon finding an imminent or substantial danger because of a hazardous substance, the California Environmental Protection Agency (C-EPA) can order the responsible parties to either remediate or pay for the remediation. Cal. Health & Safety Code § 25358.3.

Then, in Foster-Gardner, Inc. v. National Union Fire Insurance Co., 959 P.2d 265 (Cal. 1998), environmental law and insurance law joined, creating a controversial issue, namely, whether there is a duty to defend under a standard comprehensive general liability (CGL) policy that is triggered by administrative proceedings against the insured. Foster-Gardner was a pesticide and fertilizer business, and in 1992, it received an "Imminent and Substantial Endangerment Order and Remedial Action Order" (the "Order") from the C-EPA. 959 P.2d at 267.

The Order stated that Foster-Gardner was "a responsible party, and has incurred liability for cleaning up the Site." Id. at 268. Additionally, Foster-Gardner was liable for oversight costs, expenses incurred in responding to a release of hazardous substances, and it could be held liable for $25,000 for each day it refused to comply with the Order and for punitive damages up to three times the amount of any costs incurred by the C-EPA. Id. at 268-69. In short, Foster-Gardner was facing substantial expenditures in cleaning up and remediating the site.

---

[3] The Carpenter-Presley-Tanner Hazardous Substance Account Act, Cal. Health & Safety Code §§ 25300 et seq.

23

Foster-Gardner submitted its defense of the Order to four of its insurers, who had issued CGLs containing language that it would pay on behalf of the insured all sums "which the insured shall become legally obligated to pay as damages." Id. at 269 (emphasis added). The insurance companies refused to defend or inadequately fund the defense. Id. at 270.

In a four-to-three decision, the Supreme Court of California observed that "[u]nder the policies, the insurers are required to defend a 'suit,' but have discretion to investigate and settle a 'claim.'" Id. at 279. The Court determined that the Order was not a suit, and it was only if Foster-Gardner refused to comply with the Order that "an enforcement action in court might follow." Id. at 280. The Court further reasoned that "the insurers here did not contract and receive premiums to defend anything but a civil lawsuit, requiring them to defend the Order would result in an unintended windfall for Foster-Gardner." Id. at 283.

Justice Kennard along with two other Justices dissented. Acknowledging that a lay person would seek out a dictionary to determine the meaning of the "suit," Justice Kennard, "canvassed a number of lay dictionaries" and noted that "most definitions of 'suit' do include a reference to some type of court proceeding." Id. at 288. Nevertheless, Justice Kennard, cited two lay dictionaries that gave alternative definitions, referring to "legal process." Id.

Justice Kennard also took issue with the majority's conclusion that the term "suit" was unambiguous; instead, concluding that the term "claim" was unambiguous and meant "a prelitigation demand letter that may be ignored without adverse consequences." Id. at

24

289. Under this definition, a notification letter from the C-EPA does not fit the definition of a claim. Id. Indeed failure to respond to this letter results in substantial legal consequences including fines up to $25,000 per day. Id. Thus, by process of elimination, the notification letter must be a suit, or the event that initiates the suit. Id.

Drawing on the reasonable expectations of lay persons, Justice Kennard concluded:

> [A] reasonable insured would expect the insurer to pay cleanup costs whether the insured's obligation for those costs is determined administratively or judicially, and a reasonable insured would also expect the insurer to represent and defend its interest in the forum – whether administrative or judicial – in which its cleanup costs were determined.

Id. at 290. Put another way, most individuals and businesses who have paid premiums to an insurance company in exchange for the insurer to defend them against any suit would not expect to be denied this benefit simply because the environmental law statutes are enforced through and adjudicated by administrative agencies rather than by the judiciary, particularly when the consequences could be as dire as a $25,000 per day fine.

Foster-Gardner continued to be the strict law in California governing the intersection of insurance coverage and administrative proceedings until Ameron International Corp, v. Insurance Co. of the State of Pennsylvania, 242 P.3d 1020 (Cal. 2010). In Ameron, a contract dispute case over defective siphons proceeded before the former United States Department of Interior Board of Contract Appeals (IBCA), and the issue arose whether the duty to defend was triggered by quasi-judicial adjudicative proceedings before an administrative body. Id. at 1022. The adjudicative proceeding lasted twenty-two days and involved numerous witnesses and substantial evidence. Id.

25

The California Supreme Court stated that it "would exalt form over substance to find such a complaint before the IBCA insufficient simply because the IBCA is not a court of law . . . ." Id. at 1029. The Ameron Court reasoned that the IBCA pleading requirements met the adequate standard for a complaint, namely appropriate notice of each claim. Id.

Justice Kennard concurred in the judgment, but wrote separately, observing that since the Foster-Gardner rule had been announced "no sister state court ha[d] adopted [it]." Id. at 1031. Justice Kennard noted that the court was limiting Foster-Gardner's reasoning that "'suit' unambiguously refers only to court proceedings," by holding that it does not apply to administrative agency adjudicative proceedings. Id. Justice Kennard opined that "[a]lthough I would prefer that Foster-Gardner be overruled, the decision here is at least a step in the right direction." Id.

Since Ameron was a contract dispute case, the question remains, how the California Supreme Court would adjudicate an environmental law case such as the one with which we are now presented. Ann E. Carlson, the Shirley Shapiro Professor of Environmental Law at the UCLA School of Law, observed in a recent article that "20 years ago, California was an environmental leader. It still is." Regulatory Capacity and State Environmental Leadership: California's Climate Policy, 24 Fordham Envtl. L. Rev. 63, 63 (2012-2013).

Probably one of California's most impressive examples of its leadership in the environmental regulatory arena is AB 32, the California Global Warming Solutions Act of 2002. Id. at 68. AB 32's goal was quite lofty – to cut California's emissions by

26

twenty percent to achieve 1990 levels with no adjustment for population or economic growth.  Id. at 68-69.  California's goal is to achieve these levels by 2020.  Id.

To attain AB 32's objective, California implemented a renewable electricity standard, a low carbon fuel standard, regional transportation targets for local governments, certain vehicle efficiency measures, power requirements for "ocean-going vehicles," a solar roofs program, energy efficiency measures for homes, businesses, and industries, and a cap-and-trade program.  Id. at 69-70.

Since AB 32's adoption, California has met its goal of adopting mandatory reporting emissions.  Id. at 76.  The EPA, by contrast, chronically misses deadlines.  Id. Perhaps most impressive, California maintained the necessary staffing to continue implementing AB 32 through the recent recession.  Id. at 80.  Based on statutory authorization, fees are imposed on the 300 largest greenhouse gas emitters.  Id.  These fees fund all of the program's administrative needs.  Id.  AB 32 is just one shining example of California's environmental law successes.

Returning to the earlier question of what would California's Supreme Court do if presented with the controversy with which this Court is now presented, I cannot turn a blind eye to the fact that California is indeed a leader in environmental law.  This fact coupled with Justice Chin's recent limiting of the Foster-Gardner Rule and Justice Kennard's firm insistence that it should be overruled entirely certainly show a weakening of a rule that never received much support from either the California Supreme Court or the country at large from its inception.

27

But most of all, basic common sense informs me that the Foster-Gardner Rule does not further the objectives of California law. Indeed it impedes them. By holding that a remediation order from the EPA or C-EPA is insufficient to trigger the protections of CGL policies, the California Supreme Court is discouraging the environmental cleanup of its state, which from the discussion above, is clearly something that its citizens hold in high regard. "And there comes a point where [the courts] should not be ignorant as judges of what [they] know as men." Watts v. Indiana, 338 U.S. 49, 52 (1949). Accordingly, for all these reasons, I believe that if the California Supreme Court was presented with this case at this time, it would no longer permit ill-advised precedent from giving its environmental law the full and complete effect it was intended to have. Therefore, I respectfully dissent.